**THIRD DIVISION**
**DOYLE, P. J.,**
**HODGES and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**February 27, 2025**

# In the Court of Appeals of Georgia

A24A1733. THE STATE v. ALMEIDA, et al.

DOYLE, Presiding Judge.

The State appeals from the grant of a motion to suppress evidence it seeks to use to prosecute Bayley Almeida for one count of misdemeanor obstruction of an officer.[1] The State contends that the trial court erred by ruling that her arrest arose from an unlawful entry into her residence without a warrant or exigent circumstances. Because the record shows that the State failed to meet its burden to show exigency, and the subsequent arrest arose from that entry and Almeida's refusal to consent to a re-entry into her residence, we affirm the grant of Almeida's motion to suppress.

---

[1] See OCGA § 5-7-1 (a) (4) (authorizing the State to appeal from an order suppressing evidence in a criminal prosecution).

First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support them. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment. On numerous occasions the appellate courts of this state have invoked these three principles to affirm trial court rulings that upheld the validity of seizures. These same principles of law apply equally to trial court rulings that are in favor of the defendant. . . .[T]his standard of review requires us to focus on the findings of fact made by the trial court in its order and the evidence supporting those findings, rather than other evidence gleaned from the record, construing it in favor of upholding the trial court's order.[2]

Further, the relevant events were captured in the arresting officer's body cam footage, and "to the extent that the controlling facts 'are undisputed because they are plainly discernable from the [police] video recording,' . . . we review those facts de novo."[3]

---

[2] (Citations and punctuation omitted.) *State v. Rosenbaum*, 305 Ga. 442, 449 (2) (826 SE2d 18) (2019).

[3] (Punctuation omitted.) *State v. Depol*, 336 Ga. App. 191, 191 (784 SE2d 51) (2016). See also *Licata v. State*, 305 Ga. 498, 500 (1), n. 2 (826 SE2d 94) (2019) ("Although we typically defer to the trial court's factual findings in this context,

So viewed, the evidence from the suppression hearing shows that at approximately 10:20 p.m. one evening in September 2020, a sheriff's deputy responded to a call regarding a "domestic issue" at a residence. The call was based on a neighbor complaining that the residents "were out in the yard breaking windows and fighting." The deputy responded to the residence without lights and sirens so that he could "listen for arguing, fighting, [or] shooting. . . ." After pausing along the side of the house to listen for noise, the deputy walked to the front porch, testifying that "[i]t sounded like two or three people arguing or fighting and some shuffling around in the back bedroom." As the deputy approached to knock on the front door, an occupant emerged at the same time whom the deputy recognized as having an outstanding warrant for a shoplifting offense. The deputy asked the occupant his name, and as they spoke briefly, the deputy heard some yelling coming from the back part of the house.

The occupant was calm and not evasive; he explained that he did not live there, but he objected to the deputy entering the house. He offered to go get someone who lived there, and explained that everything "was ok," and "they're fine," but at that

_____

when, as here, the controlling facts are not in dispute, because they are discernible from a video, our review is de novo.").

3

point, the deputy pushed the door open and walked in, explaining, "if they're yelling and fighting I want to make sure everything's ok." The occupant countered, "nobody's fighting," as the deputy walked past him into the living room.

At that point, the deputy announced, "hey there, sheriff's office," and he was met by two occupants who immediately objected to the deputy's presence, asked him to leave, and stated that "nobody's arguing." The two occupants repeatedly objected to the deputy's presence, stating, "you need to exit the property, you have no warrant." The deputy responded by saying "alright, come outside with me." The occupants replied, "no, you're going outside," at which point Almeida appeared from the back of the house and accompanied the deputy onto the front porch and closed the door behind her.

Almeida calmly stood on the porch facing the deputy with her back to the door and answered the deputy's questions. She asked the deputy why he was there and explained that it was just family in the house and that the arguing the deputy heard was "not like that." She further explained that someone had a pre-existing wound on his hand that had re-opened and that they were trying to treat the wound. The deputy asked whether it was from a reported broken window, and Almeida explained that it

was not. The deputy stated that he needed to "go in to make sure he's ok," and Almeida replied, "no, not without a warrant." The deputy responded, "You can either allow me to do that, or I'm placing you under arrest." Almeida responded, "I guess you're placing me under arrest." The deputy then took Alemeida by the arm and told her to step out of the way as he moved her away from the door; Almeida offered no resistence and said, "that's fine, put me under arrest." The deputy told her to have a seat in a chair on the porch, and she stood calmly reiterating her objection to him entering the house, "that's breaking the law," and the deputy then stated, "I'm arresting you for obstruction." He placed her in handcuffs, and Almeida again said, "that's fine." Almeida continued to cooperate fully with the arresting deputy as he walked her to his vehicle, placed her in the back seat, and closed the door.

After arresting Almeida, the deputy, along with another deputy who had arrived on the scene, entered the house over the verbal objection of two other occupants who had appeared at the door. In the living room, the deputies encountered the injured occupant, an adult male, who explained that he was cleaning the small wound on his hand. He was not distraught or seeking aid, and he asked the deputies to go outside as he attempted to calm the remaining occupants, who were escalating their demands

that the deputies leave the residence. At this point, it was plain that no occupants needed or sought medical aid, and the only dispute was between the deputies and the objecting occupants of the house.[4]

Based on these events, Almeida was charged with a single count of misdemeanor obstruction.[5] She moved to suppress "any evidence and statements gathered as a result of the unlawful" entry into the home, including any evidence relating to her arrest. Following an evidentiary hearing at which the arresting officer testified and a recording of his body cam video was played, the trial court granted the motion to suppress. Specifically, the trial court held that the situation encountered by the arresting deputy — yelling and arguing inside the home — was not an exigency justifying his initial entry into the home without consent or a warrant. The trial court further held that the conversation with Almeida (in which he learned about an injury)

---

[4] See generally *State v. Driggers*, 306 Ga. App. 849, 852 (2) (b) (702 SE2d 925) (2010) ("An officer's conduct immediately after a legal entry 'must be carefully limited to achieving the objective which justified the entry[:] the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance.'"), quoting LaFave, Search and Seizure, § 6.6 (a), p. 468 (4th ed. 2004).

[5] OCGA § 16-10-24 (a) ("[A] person who knowingly and willfully obstructs or hinders any law enforcement officer . . . in the lawful discharge of his or her official duties shall be guilty of a misdemeanor.").

occurred only after and in response to the initial unjustified entry, so the subsequent arrest of Almeida was unauthorized. The State now appeals.

The State contends that the trial court erred by ruling that the arresting deputy was not authorized to enter the house under the exigent circumstances exception to the requirement for a warrant. We disagree.

> The Fourth Amendment to the United States Constitution protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. An unconsented police entry into [a] home constitutes a search within the meaning of the Fourth Amendment. . . . [E]ven if the officers [have] probable cause for the entry, warrantless intrusion of a person's home is prohibited by the Fourth Amendment, absent consent or a showing of exigent circumstances.[6]

It is undisputed that the deputies never received consent to enter the home, so the State had the burden to prove that the deputies were justified in entering the home due to exigent circumstances.[7] Most relevant to this case, exigent circumstances

---

[6] (Citations and punctuation omitted.) *State v. Ealum*, 283 Ga. App. 799, 801 (643 SE2d 262) (2007), citing Ga. Const. of 1983, Art. I, Sec. I, Par. XIII, *Carranza v. State*, 266 Ga. 263, 264-265 (1) (467 SE2d 315) (1996). See also *Steagald v. United States*, 451 U. S. 204, 211 (III) (101 SCt 1642, 68 LE2d 38) (1981).

[7] See *Ealum*, 283 Ga. App. at 801-802, citing OCGA § 17-5-30 (b).

include emergency situations in which an officer has a reasonable belief that "the warrantless entry [is] justified to protect or preserve life or to avert serious injury."[8] "'Whether these circumstances exist is a question of fact to be determined by the trial court, and the judge's decision, if supported by any evidence, is to be accepted.'"[9]

Here, as summarized above, the evidence showed that the arresting deputy approached the porch and encountered an occupant who did not seek help from the deputy or otherwise seem alarmed by the circumstances inside the house. The occupant calmly explained to the deputy that he did not live at the residence but offered to retrieve someone with authority to allow the deputy to enter. Nevertheless,

---

[8] (Punctuation omitted.) *Ealum*, 283 Ga. App. at 802. See also *State v. Culpepper*, 295 Ga. App. 525, 527 (672 SE2d 494) (2009) (exigency is demonstrated by "'the officer's reasonable belief that such action is a necessary response on his part to an emergency situation'").

[9] *Culpepper*, 295 Ga. App. at 527. Accord *Hourin v. State*, 301 Ga. 835, 847 (3) (c) (804 SE2d 388) (2017), quoting *Jackson v. State*, 280 Ga. App. 716, 718 (1) (634 SE2d 846) (2006). The importance of this standard is highlighted by the disagreement among the panel members in this case. This Court is a court for the correction of legal error. See *Felix v. State*, 271 Ga. 534, 539 (523 SE2d 1) (1999), citing 1983 Ga. Const., Art. VI, Sec. V, Par. III; Art. VI, Sec. VI, Par. II. Where the record on a motion to suppress can be construed to support the trial court's judgment, we are not authorized to substitute our own. See *State v. Rosenbaum*, 305 Ga. at 449 (2) ("[The appellate] standard of review requires us to focus on the findings of fact made by the trial court in its order and the evidence supporting those findings, rather than other evidence gleaned from the record, construing it in favor of upholding the trial court's order.").

the deputy said that he needed to enter the home to check on the people arguing. The video recording of the deputy's encounter at that point shows that the other occupants' voices were sporadically audible, but there was nothing on the order of screaming or commotion consistent with a violent attack. And the deputy had no knowledge of any injury at that time. Based on these circumstances, and based on our review of the body cam video, the trial court was authorized to find that, at the time of the initial entry, the deputy had heard only voices arguing inside the house, and the circumstances did not rise to a level suggesting a safety threat justifying a warrantless entry into the home. Accordingly, the trial court correctly held that the deputy's initial entrance to the home was a Fourth Amendment violation.[10]

Despite this, the State argues that Almeida's conversation on the porch gave the deputy new information — that there was an injured occupant — justifying his re-entry based on a new exigency. But this ignores two important facts. First, as the trial court ruled, the deputy's conversation with Almeida occurred only as a result of the deputy's initial unlawful entry.

---

[10] See *Ealum*, 283 Ga. App. at 803.

[T]here was no significant lapse of time between the unlawful entry and her going out onto the porch, and no intervening circumstances came between the two. Under these circumstances, it would be unreasonable to infer that [Almeida's] decision to step out onto the front porch and speak with the [deputy] was sufficiently an act of free will to purge the primary taint of the unlawful invasion.[11]

Under the "fruit of the poisonous tree" doctrine, the conversation was subject to suppression for the initial Fourth Amendment violation.[12]

Second, and more fundamental, Almeida's arrest was based on her failure to consent to the deputy's re-entry to the residence. Even if, as the State argues, the deputy was newly authorized by the exigency of tending to a wounded person, it does not follow that Almeida was required to consent to the re-entry. It is well-settled that "[o]fficers may request consent to search as long as they do not convey a message that

---

[11] (Punctuation omitted.) Id. at 804.

[12] See id. at 803-804. See generally *Jackson v. State*, 369 Ga. App. 319, 321 (893 SE2d 436) (2023) ("'An officer's conduct immediately after a legal entry must be carefully limited to achieving the objective which justified the entry: the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance.'"). Under the circumstances in this case, the deputy could have pursued the option of asking that the injured party come outside in order to assess his well-being, but he did not.

compliance with their request is required."[13] The ability to decline consent is inherent in the voluntariness that must accompany consent[14] — it is not an independent offense of obstruction. It is plain from the body cam video that Almeida fully complied with the deputy's command to step away from the door, she was not preventing his entry,[15] and she was arrested only after she was told "you can either allow me to [enter] or I'm placing you under arrest." Almeida's lack of consent in no way hindered the deputy's re-entry, and her arrest arose from her verbal refusal to consent to the re-entry after she had already moved away from the door. Almeida's failure to consent to the deputy's conduct was not unlawful and thus gave no further authority to enter the residence or arrest her.[16]

---

[13] *Cuaresma v. State*, 292 Ga. App. 43, 47 (2) (663 SE2d 396) (2008).

[14] Cf. *State v. Holtzclaw*, 341 Ga. App. 639, 644 (2) (802 SE2d 254) (2017) (holding that consent was not voluntary because the resident believed she had no choice based on the fact that police had already entered her home in her absence, and an officer told her, "'[e]ither way, we're gonna find it, so, search warrant or not, so, if you think the search warrant's gonna lessen the blow, I mean, it's not'").

[15] As Almeida stood with her back to the door, another occupant actually opened the door and exited the residence as Almeida spoke to the deputy on the porch.

[16] See generally *Ealum*, 283 Ga. App. at 805 ("In order to be guilty of the crime of obstructing a law enforcement officer, the defendant must have knowingly and wilfully obstructed a 'law enforcement officer in the *lawful discharge* of his official

11

The deputy's initial unauthorized entry tainted his subsequent conversation with Almeida that led to her arrest, and her refusal to consent did not justify re-entry or her arrest. Accordingly, the trial court did not err when it granted Almeida's motion to suppress evidence and statements gathered as a result of the unlawful first entry, including any evidence relating to her arrest.

*Judgment affirmed. Watkins, J., concurs. Hodges, J., dissents.*

---

duties.' An officer who carries out an unlawful entry into a residence or conducts an unlawful arrest is not lawfully discharging his duties, and a citizen who resists an officer under such circumstances is not guilty of obstruction.") (citations omitted; emphasis in original), quoting OCGA § 16-10-24 (a) .

A24A1733. THE STATE v. ALMEIDA et al.

HODGES, Judge, dissenting.

The trial court's order contains extensive findings of fact. As the trial court found, the responding officer had been dispatched to investigate a "domestic issue[,]" and when he arrived at the house, he heard "fighting, yelling, or arguing[,]" "screaming[,]" "movement[,]" and, later, was informed that someone in the home was "hurt and the others are trying to fix the wound." Although these facts were sufficient for the trial court to find that exigent circumstances justified both warrantless entries, it made a legal error in its assessment of these facts, as does the

majority. Because both the trial court and the majority failed to fully consider the reasonableness of the officers' actions as required by our case law, I respectfully dissent.

(a) *The first warrantless entry*. It is true that "[w]hen reviewing video evidence, we owe no deference to the trial court's findings of fact that are plainly discernible from the video and, thus, undisputed." *Snellings v. State*, 371 Ga. App. 795 (903 SE2d 177) (2024). Our analysis, however, does not stop merely with an examination of video evidence. We must also consider police officers' perception of what they observe. "[W]e review police actions from the standpoint of a hypothetical reasonable officer and must measure those actions from the foresight of an officer acting in a quickly developing situation and not from the hindsight of which judges have benefit." (Citation and punctuation omitted.) *Daniel v. State*, 303 Ga. App. 1, 2 (1) (692 SE2d 682) (2010).

Here, the officer responded to a 911 call from a neighbor who heard residents in the yard fighting and breaking windows, and who also reported "damaged windows and property." The officer testified that when he approached the outside of the house, he heard people fighting, yelling, and arguing inside, as well as "shuffling." After a guest opened the front door, the officer heard "more yelling and screaming" from two

2

or three people, apparently in the back of the house. The video recording, while perhaps less audible than what the officer heard first hand — meaning the volume of the sounds may not be "plainly discernable" from the video, see *Snellings*, 371 Ga. App. at 795 — also contains sounds of arguing, yelling, and fighting.

The majority, however, focuses on the "calm" demeanor of the guest who answered the door, and on his assertions that everything was fine and no one was arguing or fighting. But when I view these police actions as a reasonable officer would during a developing situation, *Daniel*, 303 Ga. App. at 2 (1), it is clear that the officer in the instant case was confronted with conflicting information. He could hear, *first hand*, screaming, arguing, fighting, and shuffling — contemporaneously with protestations that everything was "fine" offered by a guest whom the police officer might reasonably have thought could be involved in, or covering up, imminent danger to some other person or to property.

Our appellate courts have determined that, even in the face of conflicting information, an officer's belief that some sort of emergency intervention is required may nonetheless be reasonable and authorize warrantless entry. See *Richards v. State*, 286 Ga. App. 580, 582 (649 SE2d 747) (2007) (upholding denial of motion to suppress and finding, where neighbors reported screaming, arguing, and a child being beaten,

3

that reasonable officers could believe exigent circumstances existed even though they did not see physical evidence of a child and residents denied the presence of a child, because "such factors did not override the neighbors' 'adamant' claims that a child was present"). Here, similarly, the guest's "calm" protestations that everyone was "fine" did not override the officer's reasonable belief, based upon his observations, that someone in the house might be at risk of imminent injury or in need of assistance authorizing his warrantless entry.

Further, this Court has affirmed the denial of a motion to suppress and found that officers reasonably believed exigent circumstances existed to justify warrantless entry where officers had, arguably, less evidence of exigency than that in the instant case. In *Love v. State*, a 911 caller reported a possible burglary, but the only evidence of exigency was the open front door of a house that appeared unoccupied, with lights off; there was no evidence of forced entry, and apparently no reports of actual suspicious activity. 290 Ga. App. 486, 486-489 (659 SE2d 835) (2008). Further, officers called out several times before entering, identifying themselves as police, but received no response. Id. at 487. Nonetheless, this Court found that "the presence of a car in Appellants' driveway, combined with the other circumstances confronted by police, supported a reasonable belief that a resident of the home might be inside, the

4

victim of an accident, medical emergency, or foul play." Id. at 489. Here, the officer

had sufficient indicia, arguably more than those present in *Love*, to believe someone

"might be" in danger and in need of assistance. Id.; *Daniel*, 303 Ga. App. at 1-2 (1)

(finding exigent circumstances justified warrantless entry of a hotel room where

officers responding to an unrelated call heard yelling coming from a neighboring room,

sounds of a struggle, and a slamming door).

Further, exigent circumstances may exist in a context broader than just the risk

of injury to persons. Exigent circumstances exist when a warrantless entry is necessary

for the police

> to preserve public order, to maintain the peace, and to protect lives,
> persons, property, health and morals. In these cases, police do not enter
> a residence for the purpose of arresting or seizing evidence against an
> occupant; rather, they enter in response to what they reasonably perceive
> as an emergency involving a threat to life or property.

(Citation and punctuation omitted.) *Love*, 290 Ga. App. at 488; accord *Staib v. State*,

309 Ga. App. 785, 788 (1) (a) (711 SE2d 362) (2011). As the officer testified, he was

responding to a 911 report from the neighbors of property damage and windows being

broken. Even though this occurred before the officer arrived on scene and he did not

immediately observe any broken windows, he nonetheless heard fighting, shuffling,

5

and shouting inside the house, authorizing him to believe that property was at imminent risk of harm. *Love*, 290 Ga. App. at 489 (finding exigent circumstances "may be found in emergency situations where the police reasonably believe their assistance is required to protect property").

The trial court's findings of fact, I note, also recognized specifically that the officer had been dispatched to investigate a "domestic issue" and could hear fighting, arguing, yelling, and screaming. The trial court, however, granted the motion to suppress because it determined that "[m]ere [s]houting" does not amount to an exigent circumstance. Here, as outlined above, there was more than mere shouting. I would find that the officer in the instant case reasonably believed exigent circumstances justified his initial warrantless entry.

(b) *The second warrantless entry*. I also believe that the majority erred in determining that the second warrantless entry was unlawful. After the initial warrantless entry, Almeida came onto the porch with the officer and shut the door behind her. She blocked the officer's entry to the home and verbally denied entry until she was arrested.[1] As with the guest who opened the door before the first warrantless

---

[1] It is unclear from the record whether Almeida lived at the home and thus had standing to challenge the search. The State, however, "did not raise the standing issue

6

entry, however, the majority focuses on Almeida's "calm[]" demeanor as she tells the officer someone in the house is hurt, then explains that an old wound had been re-opened and that people inside the house are "trying to fix their wound." It is important to note context. The officer had been dispatched to the scene because of a 911 call indicating a "possible domestic incident." Almeida's report of an injured person — despite her contentions that it was "not . . . a police matter" — when coupled with the officer's simultaneously hearing yelling, fighting, and arguing, simply added more evidence of exigency. "It has been repeatedly held that reasonable concern for a victim's welfare justifies a warrantless entry." (Citation and punctuation omitted.) *State v. Driggers*, 306 Ga. App. 849, 851 (1) (702 SE2d 925) (2010).

The job of law enforcement is to protect and serve. Officers cannot protect and serve unless they first investigate. If they reasonably believe, based upon first-hand observation, that imminent risk of injury, damage, or death exists, they are not only authorized to enter the premises, they *should* enter and investigate. Why? Because if they leave without investigating, they might later return to find a house destroyed, a person grievously injured, or even a corpse. Here, as outlined above, there was ample

---

in the court below or on appeal, and so we will not address it." *State v. Ealum*, 283 Ga. App. 799, 801, n. 1 (643 SE2d 262) (2007).

evidence of exigency. Our law clearly authorizes police, even in the face of conflicting information from people who may be involved in perpetrating injury to persons or property, to enter without a warrant upon the reasonable belief that a person in the home, or the property itself, is in imminent risk of harm. In overlooking this, I believe the majority erred, and I respectfully dissent.